HAWKEYE PORTLAND CEMENT COMPANY, Appellee, v. BOARD OF REVIEW OF MADISON TOWNSHIP, Appellee; THOMAS COCHRAN, Appellant.

FEBRUARY 7, 1928.

*C. E. Hamilton*, for appellant.

*John A.* and *W. T. Guiher*, for Hawkeye Portland Cement Company, appellee.

WAGNER, J.—The Hawkeye Portland Cement Company is the owner of approximately 940 acres of land, situated in Sections 16, 17, 18, and 21, all in Township 77 north, Range 28 west of the Fifth P. M., in Madison County. All of said real estate except the southeast quarter of Section 16 was assessed by the assessor for the year 1925 at $135 per acre. The assessment of the 160 acres mentioned in the foregoing exception is not involved herein. In conformity with the statutory law, the owner of the approximately 780 acres made complaint before the board of review of the township in which the real estate is situated, contending, in substance, that said real estate had been assessed by the assessor at an amount in excess of its actual or market value, and that the assessment thereon was so out of proportion with the assessment made on other real estate in said taxing district as to be unjust, inequitable, and discriminatory. The board of review granted no relief to the owner, and in due time an appeal was taken to the district court. Upon trial, the court reduced the assessment upon all of said real estate herein involved to the amount of $60 per acre. From this action by the trial court this appeal was taken.

With reference to the valuation to be placed upon property for assessment purposes, Section 7109, Code of 1924, provides:

"All property subject to taxation shall be valued at its actual value. * * * In arriving at said actual value the assessor shall take into consideration its productive and earning capacity, if any, past, present, and prospective, its market value, if any, and all other matters that affect the actual value of the property."

Said section also provides that the burden of proof shall be upon any complainant attacking such valuation as excessive, inadequate, or inequitable. The board of review having confirmed the assessment as made by the assessor, the presumption is that the action of the board is correct. However, this presumption is one not of law, but of fact, and may be rebutted and overcome by evidence; but the burden rests upon the owner to show that the decision of the board is erroneous. *Frost v. Board of Review*, 114 Iowa 103; *First Nat. Bank v. City Council*, 136 Iowa 203; *Benson v. Town of LeClaire*, 185 Iowa 506. Has the ap-

pellee met the burden, and is the relief granted by the trial court such as should have been granted?

The real estate herein involved lies along a stream, the north branch of North River. The major portion of it is rough, rocky, broken land, and cut by ravines. A considerable portion of it is covered by scrubby oak timber and brush. Only a very small portion of the land is tillable, and such as is subject to cultivation lies in patches of irregular form. The major portion of the land lies north of the aforesaid stream, but a portion of it lies to the south thereof. From the creek or river bottom to the north side of these lands is a rise of about 140 feet. The rock outcrops on the hillside about 100 feet above the bottom. The land lying on the south side of the river consists of a bluff. Much of the land is underlaid with limestone, some of which is being quarried by the company and shipped to its mill near Des Moines, and used for the manufacture of cement. There is a spur track leading from the railroad to the quarry that is now being worked, and is situated upon the southwest quarter of Section 16. The quarry is extensively worked, the company employing at said work about 75 men. There are taken from the quarry about 350 carloads of limestone per week. The lower portion of the land is used as a dump ground for the refuse. The company has been engaged in the quarrying of rock for the last sixteen years, and there has been no quarrying done, except upon the southwest quarter of Section 16. During the aforesaid period, about 75 acres of said quarter section has been quarried. At the present rate of operation, it will require about ten years to exhaust the balance of the supply of stone in said quarter section. It is shown by the record that the probability is that, when the supply on the aforesaid quarter section is exhausted, the company will then engage in quarrying upon the 160 acres immediately east thereof,—the assessment on which 160 acres is not herein involved,—and that it would require 30 to 35 years to exhaust the supply of rock thereon. It is thus shown by the record that the probability is that many years will elapse before any quarrying is done upon any of the real estate herein involved, other than the 160 acres hereinbefore mentioned.

It is shown that, according to the geological survey, the same formation of limestone runs down through Stuart, Earlham, Winterset, Peru, and clear down to the Missouri state line.

164

The assessor assessed all lands other than that owned by the Hawkeye Portland Cement Company at what he believed to be 50 per cent of the market value, but assessed all the lands owned by said company,—no matter where located, or whether underlaid with stone,—at $135 per acre. He testified that he knew, at the time when he made the assessment, that the land owned by the company would not sell for $135 per acre, but that he was directed by the board of trustees to assess it at that figure. We shall refer to some of the assessments of adjoining tracts of real estate. The southeast quarter of Section 16, now owned by the company, but the major portion of which, at the time of the assessment, was owned by a farmer, was assessed at $96 per acre. For agricultural purposes, it is by far the best land owned by the company, and it is shown that 100 acres of the same is underlaid with the same kind of limestone as the 160 acres immediately west, where the quarry is located. The land to the north of the appellee's real estate is good farming land, and assessed at $93 to $112 per acre. The northeast quarter of the northwest quarter and the north half of the northwest quarter of the northwest quarter of Section 21, which is not underlaid by limestone, and which is owned by the company, is assessed at $135 per acre; while adjoining tracts of land are assessed at $28 to $35 per acre. The company is the owner of the southeast quarter of Section 18 and the east half of the southwest quarter of Section 17, and 320 acres immediately east thereof, all of which is assessed at $135 per acre; while the west half of the southwest quarter of Section 17, which intersperses the land owned by the company, and which 80 acres is owned by Cochran, one of the township trustees, is assessed at $54 per acre. This 80 acres is also shown to be underlaid with limestone, and to be about the same quality of land, and adapted to the same uses and purposes as that owned by the company, both to the west and the east thereof. The assessor's explanation for assessing it at $54 per acre and assessing the company's land at $135 per acre is that he assessed the 80 acres on the same basis that he did other farm land. Other instances of inequality of assessment could be given, but we deem it unnecessary. It will thus be seen that the assessor had one basis for assessing lands owned by farmers and used for farming purposes, and a sort of arbitrary basis for assessing the lands belonging to the company.

The one paramount object which the law seeks to insure in distributing the burdens of taxation is equality, and this is the chief end to be gained by insisting that all property shall be assessed at its actual value. *Iowa Cent. R. Co. v. Board of Review*, 176 Iowa 131; *Burnham v. Barber*, 70 Iowa 87; *Barz v. Board of Equalization*, 133 Iowa 563; *Benson v. Town of Le-Claire*, supra. Five witnesses shown to be perfectly familiar with the values of real estate in that vicinity testified that the fair market value of the various tracts of land owned by the company was from $35 to $85 per acre, and also gave their estimates as to the value of the adjoining real estate. Based upon said estimates, the assessed valuation of the real estate owned by the company, as modified by the court, is, indeed, sufficiently high.

We realize that absolute equality in the assessment and burdens of taxation is impracticable, but the assessing tribunals should use their utmost endeavor to make the assessment of various tracts of real estate just and equitable, as among the owners thereof. The board of review lays great stress upon the fact that the company is quarrying this limestone rock. If the company is realizing profits from the quarrying of the rock and the manufacture of the cement, it will be otherwise assessed thereon, as provided by law. While it is true that every element affecting the value of real estate, such as the purposes for which it is adapted, shall be taken into consideration in fixing its value for assessment purposes, yet what the board of review relies upon as being an important factor (the deposit of the limestone and the other conditions that go with it) in giving the real estate an increased value would be considered by many as decreasing, instead of increasing, the value thereof. Section 1305 of the 1897 Code, being the corresponding section with Section 7109 of the Code of 1924, hereinbefore quoted, provides:

"All property subject to taxation shall be valued at its actual value. * * * Actual value of property as used in this chapter shall mean its value in the market in the ordinary course of trade."

The legislature saw fit to change the last sentence to read:

"In arriving at said actual value the assessor shall take into consideration its productive and earning capacity, if any, past,

present, and prospective, its market value, if any, and all other matters that affect the actual value of the property.'' Section 7109, Code of 1924.

It thus becomes apparent that the legislature had in mind that there might be property subject to taxation which would have no market value. Under the present statute, the assessor is to take into consideration the market value, if any, of the property. True, he is to take into consideration the productive and earning capacity, if any, past, present, and prospective; but these are all elements which go to make up market value, as well as actual value. If the property has a market value, then, as it occurs to us, there can ordinarily be no distinction between market value and actual value. In *Hetland v. Bilstad*, 140 Iowa 411, upon the question of value we said:

''By 'value,' in common parlance, is meant 'market value,' which is no other than the fair value of property as between one who wants to purchase and another who desires to sell. In *Jonas v. Noel*, 98 Tenn. 440 (39 S. W. 724, 36 L. R. A. 862), it is said that 'so difficult a matter, however, is it to separate the ideas of ''value'' and ''market value,'' that it will be found text-writers and courts have frequently used these terms as interchangeable, and both as being the equivalent of ''actual value.'' ' * * * ''

In *Colsch v. Chicago, M. & St. P. R. Co.* (Iowa), 117 N. W. 281 (not officially reported), we held that the market value is the actual value, and vice versa. In *Maxon v. Gates*, 136 Wis. 270 (116 N. W. 758), it is said:

''The market value of land at any time is the price that would in all probability result from fair negotiation, where the seller is willing to sell and the buyer desires to buy. * * * The expressions 'actual value,' 'market value,' or 'market price,' when applied to an article, mean the same thing.''

In *Sanford v. Peck*, 63 Conn. 486 (27 Atl. 1057), it is said:

''The expressions actual value, market value, or market price, when applied to any article, mean the same thing.''

In *Cummings v. National Bank*, 101 U. S. 153 (25 L. Ed. 903), the Supreme Court of the United States said:

''The phrases 'salable value,' 'actual value,' 'cash value,' and others used in the directions to assessing officers, all mean the same thing, and are designed to effect the same purpose.''

Thus it is quite clear that, if property has a market value,

said market value and the actual value are usually the exact equivalent of each other. The value of the real estate owned by the company and of the real estate surrounding same is shown by the testimony of the five witnesses hereinbefore mentioned. The assessment of the real estate belonging to the company, as confirmed by the board of review, is far in excess of its actual value, and the same is so out of proportion to the assessment upon other real estate that it is unfair, unjust, inequitable, and discriminatory, as against the appellee.

After a careful perusal and consideration of the entire record, we are abidingly satisfied that the decree rendered by the trial court conforms to the law and equitable principles, and the same is hereby affirmed.—*Affirmed.*

STEVENS, C. J., and EVANS, FAVILLE, and KINDIG, JJ., concur.