IN RE APPEAL OF DUBUQUE-WISCONSIN BRIDGE COMPANY.

DUBUQUE-WISCONSIN BRIDGE COMPANY, Appellant, v. BOARD OF REVIEW FOR CITY OF DUBUQUE, Appellee.

No. 46901.

DECEMBER 17, 1946.

Czizek & Czizek, of Dubuque, for appellant.

John J. Kintzinger, of Dubuque, for appellee.

GARFIELD, C. J.— Plaintiff's toll bridge crosses the Mississippi River between Dubuque, Iowa, and the state of Wisconsin. It has an 18-foot roadway, is for the use of vehicles only, and carries the traffic on U. S. Highways 61 and 161. Its present length is approximately 1,918 feet. The portion on the Iowa side of the boundary line, in the river channel, between Iowa and Wisconsin is approximately twenty-eight per cent in value of the bridge. That part of the bridge was assessed for 1945 at $41,630. This is the assessed or taxable value fixed by the assessor for the city of Dubuque. It could not exceed sixty per cent of its actual value. See section 7109, Code, 1939, as amended by section 14, chapter 249, Acts of the Forty-ninth General Assembly (section 441.4, Code, 1946).

Plaintiff made written and oral complaint to the local board of review that (1) the assessed value was excessive and (2) inequitable in comparison with the valuation placed upon the Julien Dubuque Bridge in the same taxing district, about five miles from plaintiff's bridge. The board overruled the complaint and plaintiff appealed from such action to the district court, where the amount of the assessment was affirmed. From such affirmance plaintiff has appealed to this court.

Section 6953, Code, 1939 (section 427.13, Code, 1946), provides that toll bridges are subject to taxation and shall be considered real property for such purpose.

Pursuant to section 7134, Code, 1939 (section 442.7, Code, 1946), the district court heard the appeal in equity. The case is triable de novo here, though weight should be accorded the trial court's judgment. Iowa Bldg. Corp. v Zirbel, 237 Iowa 242, 248, 21 N. W. 2d 576, 579; Bennett v. Board of Review, 234 Iowa 800, 801, 13 N. W. 2d 351, 352; Corn Belt Theatre Corp. v. Board of Review, 234 Iowa 355, 356, 12 N. W. 2d 820, 821.

We have frequently held there is a presumption in favor of the valuation fixed by the assessor. Such valuation should be permitted to stand here unless plaintiff has carried the burden of overcoming the presumption. This burden is not

met merely by showing a difference of opinion as to value between plaintiff's witnesses and the assessor. Courts will not grant relief from an assessment because of mere difference of opinion as to values. But where it is manifest the assessment is grossly excessive, and a result of the exercise of the will and not the judgment, relief will be granted. It is the judgment of the assessor that is required in making assessments. If his action is not arbitrary or capricious or so wholly out of line with actual values as to give rise to the inference that he has not properly discharged his duty the assessment made by him and confirmed by the board of review should not be disturbed by the courts.

Among the decisions in support of the above views are Iowa Bldg. Corp. v. Zirbel, supra, 237 Iowa 242, 21 N. W. 2d 576; Bennett v. Board of Review, supra, 234 Iowa 800, 810, 13 N. W. 2d 351, 356, and cases cited; Corn Belt Theatre Corp. v. Board of Review, supra, 234 Iowa 355, 360, 361, 12 N. W. 2d 820, 823, and cases cited; Crary v. Board of Review, 226 Iowa 1197, 1201, 286 N. W. 428.

There are comparatively few bridges of this character and it is more difficult to fix the value of such a structure than of lands, horses, and the like. Sioux City Bridge Co. v. Board of Review, 192 Iowa 1224, 1226, 184 N. W. 733.

We agree with the trial court that plaintiff failed to discharge the burden of showing the assessment either excessive or inequitable. It does not appear the assessor acted arbitrarily or capriciously. So far as shown, his valuation is the result of honest judgment. The conflict in the evidence is insufficient basis for interference on our part.

In the district court plaintiff produced two main witnesses, Mr. Rhomberg, its secretary-treasurer for about four years, and Mr. Helseth, a bridge builder from Minneapolis. Rhomberg described the bridge, its cost, the income from tolls, and undertook to fix its value.

The bridge as originally built in 1901 was 2,900 feet long, of which 1,790 feet were wood trestle on the Wisconsin side. West of the trestle were four spans with a total length of about 1,110 feet. Original cost of the bridge was $105,385. In 1905 the Federal Government replaced the west 324 feet of the wood

trestle with an inverted or "upside-down" span—that is, the sides of the span were below, rather than above, the floor. In 1936 the government replaced about 484 feet of trestle, immediately east of the inverted span, with three overhead spans of modern steel-and-concrete construction on concrete piers. The remainder of the wood trestle east of these new spans was replaced by a concrete highway in Wisconsin. The cost of the inverted span was about $25,000. The three spans built in 1936 cost "considerably over $100,000." These four spans were paid for by the government but became part of plaintiff's bridge.

In 1928 wood stresses in the four west spans (the 1,100 feet not built by the government) were replaced by steel joists and a new floor was installed at a cost of $11,580. In 1944 reinforcing was done on the same portion at a cost of $5,000 and repairs were made at an added cost of $7,000.

We think it appears the bridge has been kept in good repair and was in good condition when assessed. Mr. Helseth testified, as did defendant's two witnesses, the life of this type of bridge is around seventy-five years. Plaintiff's bridge, therefore, will probably last about thirty years more. However, Helseth testified, in effect, that reconstruction at a cost close to $100,000 would be required to keep the bridge in good condition in the future.

Without any preliminary showing of knowledge of values, Mr. Rhomberg testified the value of the Iowa portion of the bridge as of January 1, 1945, was $25,021.46. This figure was reached by multiplying by three the original cost of that part of the bridge situated in Iowa on the theory the cost of reproduction would be three times the cost of construction in 1901. The cost of the work done in 1928 on the Iowa portion, to which we have referred, was then taken and increased by fifty per cent on the theory the cost of such work had increased accordingly since 1928. To these two sums was added the cost of reinforcing the Iowa portion in 1944, to obtain the reproduction cost in 1945. From this total estimated reproduction cost there was deducted eighty-eight per cent for depreciation—two per cent for each of the forty-four years since the bridge was constructed. The basis for such deduction is that the Federal Internal Revenue Depart-

ment permits an annual deduction for income-tax purposes of two per cent for depreciation of this type of structure.

Mr. Helseth fixed the value as of January 1, 1945, of the four west spans and the inverted span at $60,000. Only about the west 528 feet of the total length of these five spans (1,424 feet) are in Iowa. The inference is Helseth arrived at the figure of $60,000 by approximating the method followed by Rhomberg.

A Mr. Kuehnle, who has had wide experience in appraising property of various kinds, testified for defendant to the value of the Iowa portion of the bridge as calculated by different methods. One method was similar to that followed by plaintiff's witnesses Rhomberg and Helseth, except that Kuehnle allowed depreciation of only fifteen per cent on the piers and sixty per cent on the superstructure, rather than eighty-eight per cent on the entire bridge as allowed by Rhomberg. Kuehnle said he could see no depreciation in the stone piers. Depreciation on the superstructure was computed at one and one-third per cent per year, rather than the two per cent used by plaintiff's witnesses, because the useful life of the bridge was seventy-five rather than fifty years. In this way Kuehnle estimated the value of the Iowa portion of the bridge at $70,232. Sixty per cent of this figure would, of course, slightly exceed $42,000. (As stated, the assessed value of which plaintiff complains was $41,630.)

Kuehnle also estimated the value of the Iowa portion of the bridge by taking twenty-eight per cent of both gross and net average annual income from the bridge during the past ten years, using Rhomberg's figures for such income. Kuehnle multiplied the average annual gross income by five on the theory such income should be twenty per cent of the value of the bridge, and the average annual net income by twelve and one half on the theory such income should be eight per cent of such value. In this way the witness estimated the value of the Iowa portion at more than $74,000.

In 1914 the annual gross tolls from the bridge exceeded $6,000 for the first time. They then totaled $6,356. In 1920 they were $22,518. These are the gross receipts, net income, and net income after payment of federal income tax from 1935 to 1944:

|      | Gross | Net | After Payment of Federal Income Tax |
|------|-------|-----|-------------------------------------|
| 1935 | 44,355 | 29,577 | 25,510 |
| 1936 | 56,532 | 38,431 | 33,795 |
| 1937 | 53,616 | 34,935 | 30,753 |
| 1938 | 52,972 | 19,179 | 16,569 |
| 1939 | 55,215 | 35,185 | 28,875 |
| 1940 | 62,847 | 4,993 | 4,252 |
| 1941 | 67,097 | 34,759 | 24,741 |
| 1942 | 57,402 | 33,944 | 22,442 |
| 1943 | 46,335 | 25,173 | 18,331 |
| 1944 | 60,268 | 30,401 | 21,155 |

The average net annual income after payment of federal income tax during these ten years was $22,642. It is a matter of common general knowledge, of which we may take judicial notice, that in 1943, 1944, and parts of 1942 and 1945, during World War II, there were restrictions upon use of motor vehicles or fuel therefor, which naturally tended to reduce plaintiff's income. Receipts from tolls in the first eleven months of 1945 were $67,528. (Trial was had in December 1945.) In all probability receipts for all of 1945 exceeded any prior year even though restrictions to which we have referred were in effect during part of that year.

There is testimony future prospects for plaintiff's earning capacity are bright. Opening to traffic of the new Julien Dubuque Bridge apparently has not seriously affected plaintiff's income. When the large bonded debt of the new bridge is fully paid it will become a free bridge but there is testimony this eventuality will not greatly reduce traffic over plaintiff's bridge except by "joy riders." Mr. Rhomberg, however, predicted plaintiff's business would suffer considerable loss when the Julien Dubuque Bridge became toll-free.

The book value of plaintiff's corporate stock as of January 1, 1945, was about $125,000, of which about $88,000 was the value of the bridge as shown by plaintiff's books, and $37,000 was cash and a reserve fund to apply toward eventual demolition of the bridge. (The bridge must be removed when unfit for fur-

ther use. Rhomberg's estimate of the cost of removal was "somewhere between $50,000 and $75,000"; Helseth's was "around $80,000" at present cost.)

It appears that on January 1, 1941, the Iowa part of plaintiff's bridge was assessed at $43,820, and the assessment roll in that amount was signed and sworn to by plaintiff's then secretary. The original 1941 assessed value was subject to a general reduction of five per cent, leaving a balance of $41,630.

While there is other testimony, the above sufficiently indicates what the record shows on the issue of claimed excessive valuation.

■ The estimates of value given by Mr. Rhomberg are by no means conclusive on the question of value for the purpose of taxation. As stated, there was no preliminary showing of his knowledge of values. Ordinarily the owner of property is deemed qualified by reason of his ownership to express an opinion as to the value thereof. But the officer of a private corporation which owns the property, unless perhaps he is a managing officer, is not thereby qualified to testify to its value. It must be further shown he has knowledge of such value as qualifies him in fact. See 20 Am. Jur. 751, sections 892, 893; 32 C. J. S. 279–289, section 545b(2); annotations 5 A. L. R. 1171, 45 A. L. R. 1494. See, also, as having some bearing, Omaha Beverage Co. v. Temp Brew. Co., 185 Iowa 1189, 1194, 171 N. W. 704. It does not appear Mr. Rhomberg is managing officer of plaintiff.

Aside from the above, Rhomberg's estimates of value are based on the estimated cost of reproducing the bridge with a deduction for depreciation. If we assume the witness was qualified to testify, such evidence is entitled to consideration but it does not establish the value *for taxation*. It ignores the "earning capacity" of the bridge, "past, present, and prospective," and "other matters that affect the actual value of the property" which section 7109, Code, 1939 (section 441.4, Code, 1946), states "the assessor shall take into consideration" in arriving at the actual value of property. See, also, In re Appeal of Massachusetts Mut. L. Ins. Co., 233 Iowa 916, 928, 11 N. W. 2d 17, 22.

Both Mr. Rhomberg and Mr. Helseth admitted the income from the bridge has an important bearing on value. Rhomberg

said "the whole value of the bridge is dependent upon the income. * * * An increase in revenue would increase the value of the bridge." Helseth testified, "A bridge of this kind has no value, except a salvage value, outside of the revenue that it can produce."

We think Kuehnle's estimate of value based on reproduction cost less depreciation is entitled to as much weight as that of Rhomberg, assuming the latter was qualified to testify. So far as shown, Kuehnle does not have the interest in the outcome of the case that Rhomberg has. The principal difference in the estimates of these two witnesses is in the rate of depreciation allowed. Since the testimony shows seventy-five years is the useful life of the bridge, there seems to be reasonable basis for deducting only one and one-third per cent per year for depreciation rather than the two per cent deducted by Rhomberg. If Mr. Rhomberg's reasoning is followed to its logical conclusion, in six more years, during which the remaining twelve per cent in value may be charged off for depreciation, the bridge will be of no value. Yet the testimony shows it will probably last thirty years more and produce income that up to now has, for the most part, steadily increased.

We conclude plaintiff has not shown the valuation of which it complains is excessive.

Even though the valuation of property is not excessive, the owner is entitled to relief if the assessment is discriminatory and inequitable when compared to that of similar property in the taxing district. Equality is the paramount object the law seeks in distributing the burdens of taxation. Iowa Bldg. Corp. v. Zirbel, supra, 237 Iowa 242, 247, 21 N. W. 2d 576, 579, and cases cited; Hanson v. Board of Review, 232 Iowa 390, 394, 4 N. W. 2d 384, 386, and cases cited.

Plaintiff claims its assessment is discriminatory and inequitable in comparison with the assessment placed upon the Julien Dubuque Bridge, the other interstate bridge in this taxing district. We will assume without deciding that if this claim were established by a preponderance of the evidence plaintiff would be entitled to relief, even though the comparison is with only one other property. (Crary v. Board of Review, supra,

226 Iowa 1197, 1200, 286 N. W. 428, bears on the question suggested.)

We think the evidence does not sustain plaintiff's claim of inequality. The assessed value of the Julien Dubuque Bridge for 1945 was $225,000 ''and it appears in the assessment roll that such assessment applies to the bridge over the river.'' We find no competent evidence of the value of the Iowa portion of the Julien Dubuque Bridge, nor of the entire bridge, on January 1, 1945. It is true Mr. Rhomberg testified, over appropriate objection, the cost of construction exceeded $3,200,000, but his only knowledge came from reading a newspaper article. Further, there is no evidence of the earnings or earning capacity of the new bridge, ''past, present, and prospective.''

Presumably at least, the cost of the Julien Dubuque Bridge and the income therefrom could easily have been proven by some member or employee of the commission in control of the bridge who knew the facts. We think plaintiff did not meet its burden of proof on the issue of claimed inequality.

The record is somewhat unusual in that we do not have the benefit of the assessor's testimony. Of course, plaintiff might have called him as its witness but it probably expected defendant would offer his testimony. It would have facilitated our consideration of the case if defendant had done so.—Affirmed.

OLIVER, HALE, BLISS, WENNERSTRUM, MANTZ, MULRONEY, and HAYS, JJ., concur.

SMITH, J., takes no part.